UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| C.H. ROBINSON WORLDWIDE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AUSTER ACQUISITIONS LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | 11 C 105 |
| | ) | |
| TOM LANGE CO., et al., | ) | |
| | ) | |
| Intervening Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AUSTER ACQUISITIONS LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on (1) Plaintiff C.H. Robinson Worldwide, Inc.'s ("C.H. Robinson"), Plaintiff Jack Tuchten Wholesale Produce, Inc.'s ("Jack Tuchten"), and Intervening Plaintiffs' (collectively, "Plaintiffs") motions for summary judgment against Auster Acquisitions, LLC (Auster), and (2) Plaintiffs' and Defendant

Paul J. Duggan's ("Duggan") cross motions for summary judgment.[1]  For the reasons set forth below, Plaintiffs' motions for summary judgment against Auster are granted, Duggan's motion for summary judgment against Plaintiffs is granted, and Plaintiffs' cross-motions for summary judgment against Duggan are denied.

## BACKGROUND

Since 1993, Duggan owned and managed Jackson Capital Management, LLC ("Jackson Capital"), a hedge fund and private partnership managing company.  In addition to his work at Jackson Capital, Duggan was an investor, having invested considerable amounts of money in over 35 different ventures, spanning an array of interests and business models.  He was not involved in the daily operations of these enterprises.

In 2006, Duggan met with Dennis Nardoni ("Nardoni") and Thomas Bastounes ("Bastounes") to discuss a potential investment opportunity in a motion picture project.

---

[1]  The original Plaintiff in this suit was C.H. Robinson Worldwide, Inc. On March 18, 2011, the Court consolidated this case with a similar action filed by Jack Tuchten.  *See Jack Tuchten Wholesale Produce, Inc. v. Auster Acquisitions LLC*, No. 11-CV-125 (N.D. Ill. 2011).  Since then, several parties joined the suit as Intervening Plaintiffs:  Providencia Produce, Inc.; Georgia Vegetable Co., Inc.; Dietz & Kolodenko Co.; Woody's Tomato Corp.; Veg-Pro, Inc.; Kiko's Produce, Inc.; Jack Brown Produce, Inc.; Veg-Fresh, Inc.; Ruby Robinson Co., Inc.; Strube Celery Vegetable Co.; Durango's Products, Inc; Produce Plus, Inc.; Keith Connell, Inc.; Evergreen International, Inc.; RPE, Inc.; New York Apple Sales, Inc.; J.L. Gonzalez Produce, Inc.; Tom Lange Co., Inc.; Dayka & Hackett, LLC; EJ's Produce Co., Inc.; Domex Superfresh Growers, LLC; T.J. Produce, Inc; Hughes Produce Sales, Inc.; New Era Produce, LLC; Scattaglia Growers & Shippers, LLC; Nico Mexi Foods, Inc.; Michael J. Navilio & Son, Inc.; West Coast Tomato, LLC; Get Fresh Produce, Inc.; Everyday Fresh Produce, Inc.; Truong Enterprises, Inc.; and Quality Food Products, Inc.

During this meeting, Duggan learned that Bastounes operated The Auster Company, Inc. ("The Auster Company"), a produce company. Bastounes informed Duggan that he was open to selling The Auster Company. Although neither Duggan nor Nardoni had any previous experience in the produce industry, they decided to pursue a business venture in The Auster Company. They formed Auster to purchase the assets of The Auster Company. Duggan, Nardoni, and Bastounes each held a one-third interest in Auster.

Immediately after the purchase of The Auster Company, Duggan executed written employment agreements with Bastounes and John Cyscon ("Cyscon") to run Auster. The agreements provided that Bastounes and Cyscon were to serve as Auster's Manager of Daily Operations and Assistant Manager of Daily Operations, respectively, which included managing the day-to-day operations of the business and making decisions regarding the company's financial operations. Bastounes signed every check issued by Auster, approved and paid all invoices, oversaw inventory, and was in a position to control the proceeds of all inventory sales. Standard Bank considered Bastounes the Auster contact for issues relating to day-to-day management and operational matters, such as sales, overdrafts, and vendor payments. Standard Bank employees contacted Duggan only when they were unable to reach Bastounes.

Bastounes was primarily responsible for Auster's day-to-day business operations. Accordingly, Duggan's role in Auster's daily business was limited. Duggan never met with Auster's clients or negotiated or brokered any sales for Auster. Additionally, he never purchased or sold produce, collected receivables, deposited money, or signed any checks in connection with Auster's business operations. Apart from executing employment agreements with Bastounes and Cyscon, he did not hire or fire employees, visited Auster only two or three times per year, and did not even have keys to the building. Duggan did not receive any payments from Auster, either as salary or as a return on his investment.

However, Duggan was not completely removed from Auster's business relationships. Duggan was designated as Auster's "tax matters partner" and, at Auster's inception, Duggan executed many of Auster's financial documents, including a Commercial Guaranty for a loan with Standard Bank, a Commercial Security Agreement between Auster and Standard Bank, a Promissory Note, and a Business Loan Agreement. Duggan renewed these agreements with Standard Bank throughout Auster's existence. Additionally, Auster's K-1 schedules for 2007-2008 list Duggan as a managing member or general partner, although the same statements for 2009-2010 list Duggan as a "Limited Partner or other LLC member," while Bastounes is identified as a "General Partner or member manager."

As a produce company, Auster was obligated to comply with the Perishable Agriculture Commodities Act ("PACA"), 7 U.S.C. § 4991, *et seq.* Duggan executed Auster's original PACA license application and was identified as one of Auster's principals on the public records published by the U.S. Department of Agriculture. Duggan, Nardoni, and Bastounes were each authorized to contractually bind Auster. Additionally, both Duggan and Bastounes were authorized signatories on Auster's bank accounts with Standard Bank and Trust Company ("Standard Bank").

For most of its existence, Auster was not profitable. In 2008 and 2009, Auster's Schedule K-1 showed a loss of over one million dollars and nearly $900,000, respectively. Duggan signed Auster's tax return for both of these years. Additionally, between 2007 and 2010, Auster began to increasingly overdraft on its bank accounts. In 2010, Duggan was aware that Auster was in financial distress and received notifications from Standard Bank whenever Auster's account was overdrawn or when the balance in the account fell below $100,000. Additionally, Duggan met on several occasions with Standard Bank representatives to discuss Auster's financial status, as well as Duggan's other accounts with Standard Bank involving unrelated businesses.

On September 21, 2010, Kevin Boyle ("Boyle") of Standard Bank sent Duggan an e-mail, notifying him that Auster's account was overdrawn in excess of $300,000. Duggan testified that he contacted Bastounes about the overdraft, and based on his

conversation with Bastounes, reported to Boyle that Auster would be freezing 90% of vendor payments for a week, which would help bring the account current. Ultimately, Auster did not freeze vendor payments.

Duggan also attempted to ease Auster's financial woes, personally covering bounced checks in excess of $100,000 and investing a total of $2.8 million into Auster in 2010 alone. Additionally, an entity known as Jackson Boulevard Equities, of which Duggan and his family members were general partners, loaned money to Auster sometime in 2009, which was never repaid. Duggan attempted to restructure Auster's loans at Standard Bank and communicated with Standard Bank about how to bring Auster's accounts current.

Plaintiffs further maintain that Duggan was involved with Auster's produce suppliers. Lisa Garcia ("Garcia"), the Controller of the Central Produce Region at C.H. Robinson, stated that C.H. Robinson's representatives had personally discussed Auster's account with Duggan, including whether certain checks to C.H. Robinson had cleared. Duggan allegedly requested a statement of Auster's account with C.H. Robinson as well as copies of unpaid invoices. Garcia maintains that Duggan promised to wire transfer funds to C.H. Robinson but did not do so.

In June 2010, Auster sought to secure a steady source of perishable goods from the Tom Lange Company, Inc. ("TLC"). Duggan executed a personal guaranty to

- 6 -

secure an additional line of credit for Auster with TLC. In early January 2011, Hugh Seelbach ("Seelbach"), an officer at TLC, contacted Duggan and expressed his concern that Auster was paying other vendors while checks to TLC were bouncing. Duggan assured Seelbach that Auster's receivables and inventory were greater than its payables, and that Auster had restructured its loan with Standard Bank to reduce the principal payment amounts and to reduce the interest rate.

Ultimately, Duggan's efforts were unavailing, and Auster ceased operations in January 2011. On January 7, 2011, C.H. Robinson filed a complaint against Defendants Auster, Duggan, Bastounes,[2] Nardoni's estate, and Standard Bank, seeking enforcement of a trust pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499(c)(4). Thereafter, this case was consolidated with a similar action filed by Jack Tuchten, and over two dozen creditors subsequently filed intervening complaints claiming rights to Auster's outstanding financial obligations. Through procedures implemented by this Court, a receiver was appointed, the PACA claims have been fixed and validated, and Auster has been liquidated.

---

[2] Bastounes subsequently filed for bankruptcy protection, and this cause of action has been stayed against him pursuant to 11 U.S.C. § 362.

Presently before the Court are (1) Plaintiffs' motion for summary judgment against Auster, and (2) Duggan's and the Plaintiffs' cross-motions for summary judgment.[3]

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v. Cook Cnty.*, 563 F.3d 598, 602-03 (7th Cir. 2009). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). When faced with cross-motions for summary judgment, the court views all facts and draws all reasonable inferences in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

## DISCUSSION

### I.      Plaintiffs' Motion for Summary Judgment Against Auster

On July 26, 2011, this Court issued a Memorandum Opinion and Order (the "July 26th Opinion") determining the validity of Plaintiffs' PACA claims against Auster. *See*

---

[3] On August 23, 2012, Duggan and TLC entered into a settlement agreement and withdrew their respective cross-motions for summary judgment.

*C.H. Robinson Worldwide, Inc. v. Auster Acquisitions, LLC*, No. 11 C 105, 2011 WL 3159155 (N.D. Ill. July 26, 2011). In determining the validity of Plaintiffs' claims, we considered evidence submitted by the parties, the court-appointed receiver's findings, and any objections thereto. While we held that many of Plaintiffs' claims were valid, we did not formally grant judgment to Plaintiffs and against Auster on those claims. The uncontested documentary evidence submitted by Plaintiffs in their prior requests establishes that Auster violated its obligations under PACA, 7 U.S.C. § 499(c)(4). Accordingly, the Court grants summary judgment in favor of Plaintiffs and against Auster as outlined in the July 26th Opinion. Additionally, Plaintiffs are entitled to attorneys' fees as provided in this Court's Memorandum Opinion and Order of October 11, 2011. *See C.H. Robinson Worldwide, Inc. v. Auster Acquisitions, LLC*, No. 11 C 105, 2011 WL 4808174 (N.D. Ill. Oct. 11, 2011).

## II.    Plaintiffs' and Duggan's Cross-Motions for Summary Judgment

Duggan maintains that he was not a control person of Auster and he therefore cannot be held secondarily liable for PACA violations. Although this litigation involves dozens of parties and has seen hundreds of filings since its inception less than two years ago, the issue before the Court is fairly straightforward: was Duggan a control person of Auster such that he may be subject to secondary liability under PACA?

- 9 -

PACA comprehensively regulates the national produce industry. In order to ensure the stability of the industry, PACA affords produce sellers several protections. Among these protections is the creation of a floating trust, whereby proceeds from the sales of perishable agricultural commodities received by a licensed dealer are held for the benefit of unpaid suppliers until payment for the commodities has been tendered in full. 7 U.S.C. § 499e(c)(2); *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002).

Several circuits have held that PACA's statutory trust provision allows plaintiffs to recover against both a corporation and its controlling officers for breaches of fiduciary duty created by the trust. *See, e.g., Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 421-22 (3d Cir. 2005); *Patterson*, 307 F.3d at 669 (in dicta); *Golman-Hayden Co., Inc. v. Fresh Source Produce*, 217 F.3d 348, 351 (5th Cir. 2000); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997). Notably, PACA does not create a cause of action against an individual; rather, individual liability under PACA is based upon common law breach of trust principles. *Weis-Buy*, 411 F.3d at 421 (citations omitted).

Personal liability under PACA is limited to those "individual shareholders, officers, or directors of a corporation *who are in a position to control trust assets*, and who breach their fiduciary duty to preserve those assets." *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163 (3d. Cir. 2010) (internal quotation and citation

- 10 -

omitted) (emphasis in original). In evaluating whether an individual defendant is in a position to control trust assets, courts look beyond one's formal position within a company to consider the context surrounding the individual's position. *Sunkist Growers*, 104 F.3d at 283. In particular, courts focus on the individual's level of involvement with the actual management of the company. *Id.*; *Sato & Co., LLC v. S&M Produce, Inc.*, Nos. 09-cv-0737, 08-cv-7352, 2012 WL 929605, at *4 (N.D. Ill. Mar. 19, 2012) (collecting cases). Therefore, in addition to an individual's formal position in a company, courts must also consider whether the individual: (1) had a role in causing the breach of the trust; (2) controlled the day-to-day operations of the company; (3) signed for company accounts; and (4) was the primary actor in failing to pay under PACA. *Sato & Co.,* 2012 WL 929605, at *4.

It is undisputed that Duggan played an instrumental role in Auster's formation and had apparent authority to control trust assets. He was a one-third owner of the company, was an authorized signatory on Auster's accounts at Standard Bank, executed several of the business and financing agreements at Auster's inception, and was named on Auster's PACA license. The remaining factors, however, strongly suggest that Duggan did not maintain sufficient involvement in Auster's accounts to warrant the imposition of PACA liability: his role in causing a breach of the trust was limited, he did not control the day-to-day operations of the company, he did not sign for Auster's

accounts with PACA creditors, and he was not the primary actor in failing to pay those creditors. Although Duggan was a seasoned investor, he maintained full-time employment at Jackson Capital and had no prior experience in the produce industry. In that vein, he executed an employment agreement with Bastounes and Cyscon, whereby they would manage the day-to-day operation of the company. Bastounes had significant experience in the produce industry and Duggan reasonably relied on this experience to carry out the day-to-day operations of the business. Thereafter, Duggan did not participate in the daily operation of the business. He did not hire or fire any other employees, sell produce, collect receivables, deposit funds, or regularly step foot on Auster's premises. Duggan's limited involvement in the management of Auster weighs heavily against a finding of secondary liability under PACA.

As Duggan's involvement with Auster's daily operations was limited, so too was his relationship with Auster's PACA creditors. Duggan did not contract with any of the plaintiffs for the sale of produce, nor did he issue or receive any payments derived from such sales. He played virtually no role in determining how Auster would balance its receivables against its payables.

Moreover, although the evidence establishes that Duggan was aware of Auster's financial difficulties, he played a limited role in *causing* the breach of the trust. Personal liability under PACA is premised on the idea that a defendant oversaw the

- 12 -

misuse or misappropriation of produce, or money derived from the sales thereof. *See Bear Mountain*, 623 F.3d at 167-68. Here, Duggan never received a return on his investment in Auster. In fact, Duggan attempted to raise money to save the flailing enterprise. He refinanced Auster's loans with Standard Bank and injected large amounts of his own money into the business. If anything, the evidence establishes that Duggan attempted to rescue Auster from its financial distress at a significant personal cost, rather than contributing to the company's failure to meet its PACA obligations. *See Anthony Marano Co. v. MS-Grand Bridgeview, Inc.*, No. 08-cv-4244, slip op. at 8-9 (N.D. Ill. Dec. 17, 2009) (granting summary judgment for defendant who was a 33% owner and of the company, may have been aware that the company was not paying its PACA creditors, but attempted to "raise money to rescue the business and pay creditors").

Plaintiffs cite to only two particular circumstances in which Duggan allegedly directly exercised management over PACA assets, neither of which establishes that Duggan was a control person under PACA. First, Plaintiffs submit Garcia's declaration, wherein she avers that she spoke with Duggan on several occasions in 2010 regarding Auster's account with C.H. Robinson. In particular, Garcia stated that Duggan received e-mails from C.H. Robinson containing copies of unpaid invoices, and that Duggan actively sought to offset payables and receivables with C.H. Robinson. Additionally,

Garcia maintains that Duggan promised to wire transfer funds to C.H. Robinson but did not do so. However, Garcia's allegations are vague and do not identify with particularity the approximate dates of these communications or the frequency with which they occurred. Moreover, Plaintiffs have not submitted any documentary evidence of these alleged communications, including copies of the e-mails from which Garcia's affidavit is partially derived. Given the voluminous evidence supporting Duggan's lack of involvement in Auster's business dealings with the PACA trust creditors, Garcia's unsubstantiated affidavit is insufficient to defeat Duggan's motion for summary judgment.

Second, Plaintiffs maintain that Duggan's interactions with TLC suggest that he was personally responsible for the dissipation of Auster's funds. Duggan signed a personal guaranty for Auster in June 2010 in exchange for TLC increasing Auster's line of credit. However, the record does not support Plaintiff's assertion that Duggan personally sought to increase Auster's line of credit with TLC; rather, he merely executed a personal guaranty for the additional credit. Moreover, Duggan's personal guaranty for the extension of additional credit is consistent with his other efforts to rescue Auster's business at his own financial risk.

Plaintiffs also maintain that on January 7, 2011, Duggan made several representations to TLC regarding Auster's financial status. However, these

representations were not made within the relevant time period identified in the complaints. The actions that Duggan took to correct Auster's financial difficulties after the alleged breach as identified in the complaint do not shed any light on his involvement with the breach in the first instance. In any event, Duggan's limited interaction with a single PACA creditor that has settled its claims against him is insufficient to establish that Duggan broadly exercised management authority over Auster's PACA funds.

We recognize that Duggan's involvement with Auster was more than that of a "passive investor," as he describes it. He was designated as Auster's "tax matters partner" and signed Auster's tax returns. He was also responsible for executing renewals of Auster's business agreements, including loan and collateral agreements with Standard Bank. Additionally, when Bastounes was unavailable, Standard Bank employees would contact Duggan regarding the financial state of Auster. Nevertheless, his role at Auster did not rise to the level of personal liability to Auster's PACA creditors as a matter of law. Notably, Duggan had no role in causing the corporate trustee to commit the breath of trust and his acts, essentially trying to financially recuse the company as an investor, do not place him in an active management role. Duggan maintained his full time position at Jackson Capital throughout Auster's existence, and, having no experience in the produce industry, delegated operational control of Auster

- 15 -

to Bastounes. Accordingly, Duggan's motion for summary judgment is granted, and Plaintiffs' cross-motions for summary judgment are denied.

## CONCLUSION

In light of the foregoing, Plaintiffs' motions for summary judgment against Auster are granted. Duggan's motion for summary judgment against Plaintiffs is granted, and Plaintiffs' cross-motions for summary judgment against Duggan are denied.

Charles P. Kocoras
United States District Judge

Dated:    September 11, 2012